IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

**STATE OF TENNESSEE v. CURTIS O. SHELTON, JR.**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-CR-1226   William R. Goodman III, Judge**

_____

**No. M2020-00072-CCA-R3-CD**

_____

The Defendant, Curtis O. Shelton, Jr., was convicted by a Montgomery County Circuit Court jury of felony murder in the perpetration of or attempt to perpetrate burglary, felony murder in the perpetration of or attempt to perpetrate theft, especially aggravated burglary, four counts of especially aggravated kidnapping, three counts of aggravated kidnapping, and seven counts of attempted aggravated robbery. The trial court merged the felony murder convictions and imposed an effective sentence of life plus twenty years. On appeal, the Defendant contends that (1) the trial court erred in denying his motion to suppress his pretrial statement, (2) the evidence is insufficient to support the felony murder convictions, and (3) the trial court erred in imposing consecutive sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Daniel P. Ufford (on appeal and at motion for a new trial hearing) and Karl E. Pulley (at trial), Clarksville, Tennessee; and Michael Working (at motion to suppress), Memphis, Tennessee, for the Appellant, Curtis O. Shelton, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; John W. Carney, Jr., District Attorney General; Robert Nash and Arthur Beiber, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant's convictions relate to a July 21, 2013 home burglary that he and two codefendants committed, during which several of the house's occupants were forcibly

detained and Miles Hendrick, the victim,[1] was killed. The Defendant was indicted jointly with Kentavius Cheeks and Joseph Graham. The record reflects that Mr. Graham was tried separately and that Mr. Cheeks pleaded guilty and testified as a State's witness at the Defendant's trial and at Mr. Graham's trial.

## Hearing on Motion to Suppress

Before the trial, the Defendant filed a motion to suppress his pretrial statement given at the police station on April 15, 2014. The written motion is not included in the appellate record, but the transcript of the hearing reflects that the Defendant alleged his statement was involuntary due to the length of time he was detained in an interview room before speaking with a detective.

At the suppression hearing, Clarksville Police Detective Eric Ewing testified that he interviewed the Defendant on April 15, 2014. Recordings and transcripts of the Defendant's pretrial interview were received as exhibits. Detective Ewing identified one of the recordings as showing the Defendant in an interview room for about six and one-half hours before the interview took place. Detective Ewing thought the Defendant was taken into custody at 6:44 a.m. on a capias for other burglary charges and arrived at the major crimes unit around 7:00 a.m.

Detective Ewing testified that he advised the Defendant of his *Miranda* rights and that the Defendant signed a written *Miranda* waiver at 2:48 p.m. The *Miranda* form was received as an exhibit. Detective Ewing said the Defendant never indicated he did not understand his rights, did not ask for an attorney, and did not ask for questioning to cease. Detective Ewing said he never made promises, threatened, or physically assaulted the Defendant.

Regarding the six and one-half-hour delay before questioning, Detective Ewing testified that a large operation of serving several arrest warrants was underway that morning as part of a burglary investigation involving a string of thefts of firearms and some internet-based crimes. He said that he conducted several interviews that morning related to the burglaries and that he had received information while conducting the other interviews which led him to question the Defendant about the homicide investigation, as well.

Detective Ewing testified that the Defendant waited alone in the interview room and that police personnel checked on the Defendant periodically to see if he needed food, drink,

---

[1] For purposes of this opinion, we refer to Mr. Hendrick, the homicide victim, as "the victim." We do not intend to diminish the crimes against the other individuals who were present at the home on the night of the offenses.

-2-

or to use a restroom. Detective Ewing agreed that the Defendant stated at some point that he was cold, that the Defendant asked for a blanket, that the police department did not have blankets, and that the Defendant wore a hooded sweatshirt and sweatpants. Detective Ewing thought the room was air conditioned and said the temperature in the special operations unit office was controlled by a couple of thermostats. He said the interview room did not have a separate thermostat. He did not see the Defendant chatter his teeth, shake, or shiver. Detective Ewing said he wore a short-sleeved shirt and pants while in the room.

Detective Ewing testified that the Defendant began making inculpatory statements about thirty minutes into his interview, which included the approximate fifteen-minute period in which Detective Ewing obtained biographical information and advised the Defendant of his rights. Detective Ewing agreed that at some point, the Defendant asked, "Am I being detained?" and that Detective Ewing responded "Yes, you are being detained." Detective Ewing agreed that he did not have probable cause to arrest the Defendant for the July 21, 2013 crimes before the Defendant's interview and that he developed probable cause for this arrest after the Defendant's interview.

Detective Ewing testified that he did not know the Defendant's mental capacity but thought the twenty-three-year-old Defendant was a high school graduate. Detective Ewing said the Defendant helped him spell words Detective Ewing wrote during the interview.

Clarksville Police Detective Chris Nolder testified that the Defendant was arrested on April 15, 2014, for offenses related to burglaries and "Tag.com," the latter of which he agreed was a "burglary ring." Detective Nolder said six to ten people were interviewed that day. He agreed that Detective Ewing "wanted to test [the other people's] statements out" on the Defendant and that the Defendant implicated himself as the shooter in the homicide. Detective Nolder agreed that he did not think probable cause existed to arrest the Defendant for the homicide based upon the statements of two other people that the Defendant admitted to them that he committed the homicide, but that probable cause existed once the Defendant implicated himself in his statement. Detective Nolder agreed it took a long time to begin the Defendant's interview because "[a]lmost everyone" else was interviewed first. Detective Nolder said Kentavius Cheeks, a jail inmate at the time and the Defendant's codefendant in the present case, was interviewed after the Defendant.

Detective Nolder testified that he had no knowledge whether the Defendant complained of the interview room temperature. Detective Nolder said the Defendant's ankle had been shackled to the interview room wall.

The recording of the Defendant's interview reflects that an unidentified officer came into the interview room to see if the Defendant needed food, drink, or to use a restroom, that the Defendant said he did not need anything, and that the Defendant sat huddled in a

chair with his sweatshirt hood over his head and an arm inside the body of his shirt, rather than the sleeve. His knees were bent, and his feet were on the chair's seat. He asked if he were being detained, and the officer responded that he was. The Defendant asked for a blanket, and the officer said he would check to see if they had any. The officer reentered the room and identified himself as Detective Ewing. The Defendant sat up in the chair, put his feet on the floor, and looked at the documents as Detective Ewing wrote the Defendant's information on them. Detective Ewing read the Defendant his *Miranda* rights; the Defendant looked at the *Miranda* document as the detective read the rights; and the Defendant signed the written waiver. After about nine and one-half minutes, Detective Ewing began talking to the Defendant about the investigation. After about twenty-eight minutes, Detective Ewing asked the Defendant if the Defendant had gone into the house where the homicide occurred with the intent to kill someone, and the Defendant said, "No. No. No." The Defendant then described the relevant events, stating that a person swung at him as he walked downstairs and that the gun "went off." He denied pulling the trigger. He said he went to the house with the intent to "[b]urglarize" and to take property. He said he brought the gun due to "fear" and for protection. Throughout the interview, the Defendant asked questions about the degree of homicide with which he was going to be charged, and Detective Ewing told the Defendant that he did not know. Detective Ewing remained seated and did not raise his voice or threaten the Defendant during the interview. After one hour and twenty-five minutes, the Defendant asked to use the restroom, and the interview stopped for him to be allowed to do so. When he returned to the room, the officer who had escorted him out of the room for the restroom break told the Defendant to let him know if he needed "water or anything." Detective Ewing returned to the room, gave the Defendant a canned drink, and continued the interview.

The trial court denied the motion to suppress. The court found that the Defendant knowingly waived his *Miranda* rights and that, notwithstanding the delay before the Defendant's interview, his statement was made voluntarily.

## Trial

At the trial, retired Clarksville Police Officer Chris MacMillan testified that he responded to the scene of a home invasion around 3:15 a.m. on July 21, 2013. He said that inside the house, two large televisions were in a room upstairs and appeared out of place. He said that four or five men in various stages of dress were in the room and that some of their wrists were bound with duct tape. He said the victim lay in a downstairs "hangout room" about ten to fifteen feet from the bottom of the stairs with an unidentified man attending the victim. Mr. MacMillan said that he began rendering aid to the victim by applying a towel to the victim's wound and that Sergeant Beebe assumed the first aid responsibilities from him. Mr. MacMillan said he took two witnesses upstairs and tried to calm the house's occupants. He said that one of the occupants had a "pretty good gash on

-4-

the back of his head." He said he had the occupants prepare written statements, which he collected for the detectives to review later.

Clarksville Police Officer Gregory Beebe testified that he responded to the scene around the same time as Mr. MacMillan. Officer Beebe said that about five people were upstairs, that they pointed downstairs, and that he went downstairs immediately. He said that at the bottom of the stairs, he saw a reddish-brown stain on the wall and a shell casing on the floor to the left of the stairs. He saw a man, who later identified himself as Dillon Correa, seated in a chair with his hands and feet bound with duct tape. He said the victim lay on the ground about twelve feet from the stairs with another man kneeled beside the man, applying pressure to the victim's chest. Officer Beebe said he "took over" for the man applying pressure to the victim's chest. Officer Beebe said the victim was conscious and was able to identify himself. Officer Beebe said he saw a hole which appeared to be a gunshot wound on the victim's chest and that he checked the victim's back and saw another hole. He said that he asked the victim questions related to medical history as he applied pressure to the victim's chest, that the victim stated he did not know who shot him, and that the victim stated, "I'm dying," about the time the EMTs arrived.

Clarksville Police Detective Avery Lambert testified that he responded to a Cherry Tree Lane address on March 15, 2015, which other evidence showed was approximately twenty months after the offenses in the present case. He said that the homeowner showed him a black, "highpoint" nine-millimeter handgun on the ground outside a window of the house. Detective Lambert identified the gun, which was received as an exhibit.[2] He said the gun was not found in Ringo Creek. He said that a shooting had occurred on Peabody Drive on March 15 and that "[t]he initial officer on [the] scene stated that there were individuals running towards Cherry Tree Lane[.]"

Clarksville Police Officer Darren Koski testified that on July 21, 2013, he photographed the scene of the shooting related to the present case. He identified the photographs, which were received as exhibits. Some of the photographs depicted areas in the basement. These photographs showed duct tape in several locations, a hammer, a "tire tool," a shell casing, a bullet projectile, a "red brown stain" on a couch, a hole in the wall, and a Bob Marley poster on the wall. Other photographs depicted duct tape on the front porch, a television at the base of the stairs, the living room, and a dollar bill in grass in the yard.

William Brock testified that he lived at the house where the July 21, 2013 incident occurred. He said Donald Ware, Mr. Ware's wife, Cody Shelton,[3] and Mr. Shelton's

---

[2] Other evidence received at the trial connected the gun to a shell casing recovered in the present case.

[3] We note that Cody Shelton and the Defendant share the same surname. We will refer to the Defendant as

girlfriend also lived at the house. Mr. Brock said that a party occurred at the house on the afternoon and evening of July 20, which was attended by the house's residents, as well as Greg Berger, Christopher Roberts, Ellis Klipenshire, Rufus Dockins, Dillon Correa, the victim, the victim's cousin "Spencer," and others whose names Mr. Brock did not recall. Mr. Brock said alcohol and hallucinogenic mushrooms were consumed during the party. He said that he consumed mushrooms around 3:00 p.m. but that he did not drink alcohol. He said the party ended around midnight and that nine people remained in the house: himself, the victim, Mr. Berger, Mr. Ware, Mr. Ware's wife, Mr. Roberts, Mr. Shelton, "Brandy," and Mr. Correa. Mr. Brock said he, the victim, Mr. Correa, and Mr. Roberts were in the basement after the party and that the others slept in rooms upstairs. Mr. Brock said that he went upstairs to get a sleeping bag for the victim around 1:00 or 2:00 a.m., that the effects of the mushrooms he consumed earlier had worn off, and that he heard "some tearing going on" as he walked downstairs to the basement. He said that as he reached the bottom of the stairs, he saw duct taped feet through the doorway. Mr. Brock said that a man came from the corner and held a gun to Mr. Brock's head and that another man "came out from behind him with a tire iron." He said the man with the gun told him to raise his hands, that he complied, and that he was "beat[en] with a tire iron" across the arms. He said he could not see the face of the man with the gun because the man's face was obscured by a hood and a bandanna. He said the men got him into "the other room," where they placed him on his stomach and bound his hands and feet behind his back with duct tape. He said he was compliant with the men. He said Mr. Correa and the victim were on their stomachs and bound with duct tape, as well. Mr. Brock said he saw a third man with his face obscured by a hood and bandanna in the "basement room." Mr. Brock said the three intruders were black. He said that the intruders asked, "Where's the weed? Where's the money?" and that they demanded his car keys. He said that after he responded that "there was no weed" and that he did not drive, the man with the tire iron hit him on the head with the tire iron and again asked for weed. Mr. Brock said blood from his head ran down his face from the blow.

Mr. Brock testified that the intruders with the gun and the tire iron went upstairs. Mr. Brock said that when he looked around the room in an effort to assess the situation, the intruder who remained in the basement hit Mr. Brock's head with a rubber mallet. Mr. Brock said that the intruders who had gone upstairs returned with Mr. Berger and that they placed Mr. Berger on his stomach and bound him with duct tape. Mr. Brock said the intruders beat Mr. Roberts, who was asleep on the couch in the basement, until he woke, at which point they bound Mr. Roberts with a green rope. Mr. Brock described Mr. Roberts as bloody after the beating. Mr. Brock said the men with the gun and the tire iron again left the basement, returning with Mr. Shelton and binding him with duct tape, and later with Brandy Davis, who the intruders bound with duct tape. Mr. Brock said that when seven individuals were bound in the basement, the men with the tire iron and the gun went

---

"the Defendant" and to Cody Shelton as "Mr. Shelton."

-6-

upstairs. He said the third intruder began going through the victim's pockets and that the victim broke free of his restraints and began wrestling with the man who was going through his pockets. Mr. Brock said that he broke free of his restraints and joined the victim in attempting to subdue the intruder and that four others broke free of their restraints. Mr. Brock said that none of the house's occupants had weapons and that he threw a hookah vase at the intruder, which hit the intruder's back. Mr. Brock stated that Mr. Berger "[p]ut [the intruder] through the roof of the basement ceiling," breaking some tiles. Mr. Brock said the intruder called out, "Help me. They got me. They're free. Help me." He agreed the intruder was "slammed around" in the struggle.

Mr. Brock testified that after a minute or two, the intruder with the gun appeared in the doorway of the basement. Mr. Brock did not see the intruder with the tire iron. Mr. Brock said that after about fifteen seconds, the armed intruder fired his gun at the victim. Mr. Brock said that before the intruder fired the gun, Mr. Brock did not see anyone within arm's reach of the armed intruder or bump into the armed intruder. Mr. Brock said the armed intruder did not drop the gun. Mr. Brock said the three intruders left the basement. When shown a photograph of a tire iron and a mallet, he said that in the months he had lived at the house, he not seen these tools in the house. Mr. Brock said the armed intruder returned, gestured with the gun for the house's occupants to stay away, and retrieved a shoe that was on the ground.

When asked to view the Defendant in the courtroom, Mr. Brock said he did not recognize the Defendant as anyone he had ever seen at the house where the incident occurred. He agreed he had not been able to see the intruders' faces on the night of the incident. Mr. Brock said the Defendant did not have permission to be in the house. Mr. Brock acknowledged that in prior testimony, he had not identified the Defendant as being involved in the incident. Mr. Brock agreed that the intruder with the gun did not strike him with a tire iron, bind him with duct tape, or move him to another part of the house. Mr. Brock said that at the time the intruder with the gun fired it, no one was "beating on anyone" and that the closest person to the intruder with the gun was Mr. Correa, who was still on the floor. Mr. Brock said the house's occupants stopped physically assaulting the intruder who had remained in the basement once they saw the intruder with the gun appear at the bottom of the steps.

Gregory Berger testified that on July 20, 2013, around 6:00 to 7:00 p.m., he went to a party at the house where the incident occurred. He said that as the party was ending, he was on the basement couch and that Mr. Correa was playing Xbox in the room. Mr. Berger said the basement was subdivided with a blanket to make two rooms and that he thought the victim was in the "other room."

Mr. Berger testified that he went to sleep on the basement couch around 2:00 to 3:00 a.m. He said he woke when he was hit on the back of the head with sufficient force to

cause bleeding. He said he turned and saw a gun in his face. He saw three intruders, one of whom held the gun, and one of whom held a crowbar or tire iron. He said the intruders' faces were covered with bandannas. He said that the intruder who was assaulted by the house's occupants had "dreads." Mr. Berger said the intruders bound his hands behind his back with rope and left him facedown on the couch. Mr. Berger said the intruders bound and beat other occupants of the house. He said the intruders asked for money and marijuana. He said the intruders told Mr. Roberts and the victim that the intruders would hurt them if they did not provide money and marijuana. Mr. Berger said the intruders seemed more focused on Mr. Roberts, Mr. Brock, and the victim. Mr. Berger said that Ms. Davis and Mr. Shelton were in the basement and that the intruders brought Mr. Correa downstairs.

Mr. Berger testified that two intruders went upstairs, that Mr. Roberts and the victim broke free from their restraints, and that Mr. Roberts and the victim began "beating . . . up" the remaining intruder. Mr. Berger said Ms. Davis broke free from her restraints but did not participate in beating the intruder. Mr. Berger said he freed himself from his restraints and joined in the effort to subdue the intruder. Mr. Berger said the intruder yelled to the other intruders for assistance. Mr. Berger said he went into the other room separated by the blanket to retrieve a kitchen knife that was used to prepare a hookah to smoke tobacco. He said that as he moved the blanket and before he was able to get to the knife, he heard a gunshot and saw the victim standing and "holding himself, saying that he just got shot." Mr. Berger said he did not see the gunshot hit the victim. Mr. Berger said he and Mr. Roberts had the victim lie on the ground and applied pressure to the victim's wounds. Mr. Berger said the intruders were gone at this point.

Mr. Berger testified that his head was "gashed open pretty wide" and that when the EMTs arrived, they applied a "butterfly stitch" to his head wound, but that he declined their offer to take him to a hospital. He said the EMTs also rendered first aid to Mr. Brock for a head wound.

Mr. Berger testified that during the incident involving the intruders, the basement lights had been off and that the only light came from a television's blue screen. He agreed that he could not identify the intruders.

Clarksville Police Officer William King testified that he responded to the scene on July 21, 2013, as a crime scene investigator. He identified the following items collected at the scene, which were received as exhibits: a wrench found on the living room couch; a rubber hammer from the living room couch; ceiling tiles, including one with hair and one "with R.B.S." from the basement floor; duct tape from several locations in the basement and living room; a nine-millimeter shell casing from the basement staircase landing, "R.B.S. swabs" from the basement living room floor, hallway door to the basement, red chair in the basement, and floor next to the red chair; and a "projectile" from the basement.

Erin Carney, M.D., an expert in forensic pathology, testified that she performed the autopsy of the victim's body. She stated that the cause of death was gunshot wound to the chest and that the manner of death was homicide. She said she did not observe stippling or soot, which would indicate the gunshot had been fired from a distance of at least three feet. She noted an entrance wound on the victim's front chest and an exit wound on his back. She said the victim had abrasions and contusions on his cheeks, forehead, right eyelid, face, and lip. She noted scrapes and bruises on the victim's wrists and arms, right shoulder, knees, and left foot. She said the bruising she observed on the wrists and forearms could indicate the victim had been bound and had struggled against the restraints. She identified a photograph of the scrapes and bruises on the victim's left cheek, which she agreed indicated the victim had sustained blunt force trauma. She said she also observed injuries to the victim's scalp indicating he had suffered blunt force trauma. Dr. Carney identified duct tape she removed from the victim's ankle during the autopsy. She said the victim's toxicology analysis showed the presence of "the active ingredient of marijuana" in his blood but not the presence of alcohol. Dr. Carney's autopsy report was received as an exhibit.

Mark Muiznieks, M.D., testified that he provided emergency medical care to Joseph Graham, who other evidence identified as one of the Defendant's codefendants, at the emergency room around 2:30 p.m. on July 21, 2013. Dr. Muiznieks stated that Mr. Graham reported shoulder pain resulting from "wrestling" the previous night. Dr. Muiznieks said that Mr. Graham had a "clavicle fracture for the collarbone" and that "a fair amount of blunt force" would be required to break a person's collarbone. Dr. Muiznieks said Mr. Graham was given a sling and medication and was released from the hospital.

Brandy Davis testified that on July 21, 2013, she lived at the house where the incident took place and that she and her boyfriend, Mr. Shelton, had lived there less than one month. Ms. Davis said that on July 21, 2013, a party began at the house around 7:00 p.m. and that some friends had been at the house earlier. She said she drank a couple of wine coolers between 8:30 and 10:00 p.m. She was unaware of anyone using marijuana that night.

Ms. Davis testified that she and Mr. Shelton went to their upstairs bedroom to watch a movie around midnight or 1:00 a.m. She said she fell asleep but woke and realized Mr. Shelton was no longer in the room. She said she went to look for him and was approached by two unfamiliar black men whose faces other than their eyes were covered with bandannas. She did not notice anything in the men's hands. She said the men told her to go downstairs and escorted her to the basement. She said that in the basement, she saw Mr. Roberts asleep on a couch, Mr. Shelton face-down on the floor with his arms bound together behind his back and his ankles bound together, Mr. Correa on a couch but not bound, and a person she thought might have been Mr. Brock "against a wall." She said

that she lay on the floor next to Mr. Shelton to see if he was still alive and that the intruders bound her hands behind her back with duct tape and placed duct tape over her mouth.

Ms. Davis testified that she heard a person ask, "Where's the weed? Where's the money? Where's the drugs?" She said that she heard a struggle behind her and that she shifted her body to kick a black man who was on the ground when she realized he was not one of her friends. She said others were beating up the man. She said that she heard someone on the telephone with 9-1-1 and a gunshot and that she got into a closet. She said that she had not seen her television on the steps when the intruders took her downstairs but that she saw one there after the police arrived.

Ms. Davis testified that during the incident, someone asked for her laptop computer password but that no one removed the duct tape covering her mouth to allow her to talk. She said that after the incident, someone said they found her laptop computer and that she had not authorized anyone to take it. She agreed the computer was still at the house after the incident. She said she cried and blacked out from anxiety and fear during parts of the incident. She did not recall having thrown a dumbbell at one of the intruders but acknowledged that Mr. Shelton told her she had.

Retired Clarksville Police Investigator Timothy Anderson testified that he had been the initial lead detective in the present case. He said he responded to the house where the incident occurred and saw two people in the front yard who had duct tape that had been partially removed from their wrists and feet. Mr. Anderson said a television sat on a landing on the stairway inside the house. He saw a tire tool or wrench on the back of the living room couch and one or more people in the living room. Mr. Anderson said several people, some of them still bound with duct tape, were in the basement. He thought the victim had been transported to the hospital before he arrived and thought eight other occupants were in the house. Mr. Anderson said some of the basement ceiling tiles had collapsed onto the floor. He said DNA samples were collected from the house's occupants and from items and stains in the house.

Mr. Anderson testified that after he left the scene on July 21, 2013, he went to a hospital to complete paperwork related to the victim and to investigate whether anyone had presented for medical treatment from injuries related to a "pretty significant fight." Mr. Anderson said that he saw Mr. Graham, who other evidence showed was one of the codefendants, wearing a sling and with an ice pack on his shoulder at the hospital and that Mr. Anderson asked Mr. Graham about his injuries. Mr. Anderson said Mr. Graham stated that he had been injured while "play wrestling" and being body-slammed by his friend, "Roger," at Roger's house. Mr. Anderson said that Mr. Graham did not know Roger's last name or address, other than that Roger's house was "somewhere off of Tiny Town Road."

Mr. Anderson testified that he and other officers canvassed the neighborhood where the crimes occurred on the evening of July 21, 2013. Mr. Anderson said that he saw Mr. Graham walking about one-fourth mile from the house where the crimes occurred and that the authorities discovered Mr. Graham lived in the same neighborhood about two- to three-tenths of a mile from the house where the crimes occurred. Mr. Anderson agreed that Mr. Graham was a suspect but that no arrests were made for several months because insufficient probable cause existed.

Dillon Correa testified that he was at the house where the incident occurred on July 21, 2013, and that he was a frequent visitor to the house and was friends with its residents. He said he was on active duty in the Army at the time. He said he went to the house on July 20 for "partying," where he ate two to three grams of hallucinogenic mushrooms. He said Mr. Shelton, Mr. Berger, the victim, and possibly Mr. Roberts also ingested mushrooms. He said that sometime after midnight on July 21, he became aware of the home invasion when he looked from the kitchen down the stairwell to the basement and saw three masked intruders. He said that they wore purple and black bandannas, that he saw "some dreadlocks," and that one intruder pointed a black, three-inch-bell, "highpoint," nine-millimeter handgun at him. Mr. Correa said that the armed intruder motioned for Mr. Correa to come with him and that Mr. Correa complied. Mr. Correa said he went into the basement, where he was "hogtied with duct tape" around his ankles and wrists. He said the intruders placed him near the doorway, where he would have been visible from the stairwell. Mr. Correa said the intruders woke Mr. Berger, who was asleep on the couch, and hogtied him. Mr. Correa said the intruders told him not to look at them. Mr. Correa said that eventually, Mr. Shelton, Ms. Davis, and Mr. Brock were brought downstairs, that Mr. Brock was hit on the head with a blunt object that appeared to be a tire iron or crowbar, and that Mr. Berger "was probably pushed around . . . and beaten a little." Mr. Correa stated that the victim, who was hogtied, was also present. Mr. Correa said that one of the intruders took his wallet, which contained his military identification, his Social Security card, cash, and possibly his driver's license, and that two intruders went upstairs. Mr. Correa said the intruders kept asking, "Where's the weed at?"

Mr. Correa testified that the intruder who remained in the basement had the gun or the blunt object and that this intruder "might have got a lick in or two on someone." Mr. Correa later said one of the intruders who left the basement eventually returned with the gun. Mr. Correa said that the victim and some of the others broke free of their restraints and attacked the intruder but that Mr. Correa had not freed himself from his restraints at this point. Mr. Correa said that the intruder in the basement called out several times, "Dee get down here," and that the other two intruders returned to the basement. Mr. Correa said that one of the intruders who returned to the basement had the gun and fired it. Mr. Correa said the intruders "were getting the crap kicked out of them" in a struggle. Mr. Correa thought the intruder who returned to the basement and did not have a gun "was getting his head lifted into the ceiling" by Mr. Roberts. Mr. Correa did not recall Ms. Davis throwing

-11-

a dumbbell at one of the intruders and, when asked if he recalled "Ms. Davis throwing the dumbbell at the man with the weapon and causing the weapon to pop off," Mr. Correa replied, "That never happened." Mr. Correa said he had been near the intruder who fired the weapon and that he had seen the intruder pull the trigger. He described the intruder's firing the weapon as "extremely cogent and intentional" and said no one had bumped into the intruder before the weapon discharged. Mr. Correa said that the intruders left the house and that the people in the basement tried to render aid to the victim.

Kentavius Cheeks testified that he was charged, along with the Defendant and Mr. Graham, for the crimes that occurred in the present case. Mr. Cheeks said that he pleaded guilty to second degree murder, that he was serving a twenty-five-year sentence for the offense, and that his plea agreement required his truthful testimony against the Defendant and Mr. Graham.

Mr. Cheeks testified that on July 20, 2013, he was with the Defendant and Mr. Graham on the street of the house where the incident occurred and that they were "doing the terror by night" mentioned in the Bible. Mr. Cheeks said he saw a house where a party appeared to be happening and that a man next to a car at the house dropped money. Mr. Cheeks said that Mr. Graham stated, "[T]hey're partying, they're drunk, let's go hit a lick." He said "hit a lick" referred to committing a robbery. Mr. Cheeks stated he, Mr. Graham, and the Defendant went to the Defendant's house, which was in the same neighborhood as the house where they intended to commit the robbery. Mr. Cheeks said the Defendant went inside the Defendant's house and returned with a gun, a shirt for Mr. Cheeks to place over his face, and gloves.

Mr. Cheeks testified that he, Mr. Graham, and the Defendant parked on a street near the house they were targeting, walked between two houses, jumped some gates, and entered the house from an open garage in the back. Mr. Cheeks said that they entered a room with a Bob Marley poster and that they saw others in the room. Mr. Cheeks said he did not have the gun or the crowbar at this point and that Mr. Graham had the duct tape. Mr. Cheeks said that as they entered the house, a man was descending the stairs and that Mr. Shelton told the man to go into the "Bob Marley room." Mr. Cheeks stated that Mr. Graham used duct tape to restrain the people in the basement and that Mr. Graham did not have the gun in his hand when he duct taped the people. Mr. Cheeks agreed that he and the Defendant passed the gun back and forth. Mr. Cheeks said he went upstairs to look for items to steal and returned to the basement three times. He said that on the first trip upstairs, the Defendant accompanied him, that they saw a woman asleep in a bedroom, that they took her downstairs, and that Mr. Cheeks took a television from her bedroom. Mr. Cheeks said that additional occupants of the house were brought downstairs and that eventually, seven people were bound with "duct tape or something else" and held in the Bob Marley room. Mr. Cheeks said Mr. Graham applied the duct tape to the house's occupants. Mr. Cheeks said he did not demand anything from the house's occupants but that the Defendant asked

-12-

for money. Mr. Cheeks said that he took a second television and that the Defendant took some $1 bills, the latter of which he, Mr. Graham, and the Defendant split after they left the house.

Mr. Cheeks testified that he and the Defendant were upstairs and that he heard "rumbling noises," which sounded like someone had hit a wall. Mr. Cheeks said that the Defendant went downstairs holding the gun and that Mr. Cheeks followed. Mr. Cheeks said that he did not hear any screaming for help that prompted him and the Defendant to go downstairs to investigate the rumbling sounds. Mr. Cheeks said they went slowly down the stairs. Mr. Cheeks said that as the Defendant reached the bottom of the stairs, Mr. Cheeks saw a man "come across a corner" and hit the Defendant with an object. Mr. Cheeks said he could not see into the Bob Marley room. He said he heard a gunshot. He initially testified that he did not see the gun fire, but he later stated that he saw the Defendant fire the gun but that he "did not see the fire from the gun." Mr. Cheeks acknowledged his prior testimony, in which he had stated that the victim hit the Defendant with an object, after which the Defendant shot the victim. Mr. Cheeks said he stated to the Defendant, "Well, you shot that man." Mr. Cheeks said the Defendant responded, "No, I didn't." Mr. Cheeks said that he and the Defendant fled the house through the garage and that Mr. Graham called him and the Defendant as he and the Defendant reached the car. Mr. Cheeks said he went back to the house and entered the garage but that he turned and ran once he saw Mr. Graham fleeing the house.

Mr. Cheeks acknowledged that in a pretrial statement, he had stated that the Defendant said, "I think I shot the dude," after the incident. Mr. Cheeks said that he "made that up" and that the Defendant never made the statement about shooting someone. Regarding his proffer, which he signed in connection with his plea agreement, he acknowledged that he reported having said, "Why did you shoot him?" to the Defendant and that the Defendant had responded by holding a gun in Mr. Cheeks's face and stating, "You better not say s--- or I'll kill you and your family." Mr. Cheeks agreed that he had said in the proffer that when Detective Nolder had asked him if he knew the Defendant, Mr. Cheeks "never said nothing" because he knew that he could be putting himself and his family "in harm['s] way." He said this was the reason he was hesitant to testify. He agreed that when he was interviewed on April 16, 2014, he said he had "never hit a lick with [the Defendant]" in his life and that he had not seen the Defendant shoot the victim. He acknowledged that he had said in the April 16 statement, "What is so crazy, I wasn't even f------ there." He also acknowledged, however, that he said in his April 16 statement that he had identified the shooter as the Defendant. He agreed that he had lied in the April 16 statement when he said that he had not been present and that he had not "hit a lick" with the Defendant.

Regarding his possession of the gun during the incident, Mr. Cheeks testified that he did not intend to shoot anyone and that he was not a killer. He said his purpose in having

the gun was "just to put people in fear." He said he did not shoot the victim. He agreed that the Defendant had the gun when the intruders reconvened at the car.

Regarding inconsistencies in his pretrial statement, his testimony at Mr. Graham's trial, and his testimony at the Defendant's trial, Mr. Cheeks stated that his testimony at the Defendant's trial was truthful. Mr. Cheeks agreed that he had been consistent about the Defendant's identity as the shooter in the pretrial statement, the proffer at Mr. Cheeks' guilty plea hearing, his testimony at Mr. Graham's trial, and his testimony at the Defendant's trial. Mr. Cheeks said the Defendant brought the gun to the house where the incident occurred but acknowledged that the Defendant gave him the gun during the incident.

Tennessee Bureau of Investigation (TBI) employee Shelly Betts-Carman, an expert in firearms analysis, testified that she examined the "highpoint" C9 black semiautomatic pistol and the fired Winchester nine-millimeter cartridge casing collected as evidence in this case. She said the cartridge casing was consistent with having been fired from a "highpoint" pistol. She said she entered data regarding the cartridge casing into a database and determined, based upon prior testing performed on the pistol, that the "cartridge case linked to the pistol." She compared test-fired cartridges from the pistol with the cartridge casing that was recovered as evidence and concluded that the cartridge casing had been fired from the pistol. She said the pistol had four safety mechanisms.

TBI Special Agent Forensic Scientist Gregg Fort, an expert in forensic biology, testified that he received buccal swabs collected from the Defendant, the codefendants, Mr. Roberts, Mr. Berger, Mr. Shelton, Mr. Correa, Caelyn Nance, Mr. Ware, Mr. Brock, Ms. Davis. Agent Fort said he also received a blood sample collected from the victim. He used the samples to generate DNA profiles for each individual.

Agent Fort tested items collected from the scene for the presence of blood and DNA. He tested four samples from the rope collected at the scene. Two contained a mixture of DNA from Mr. Berger as the major contributor and with inconclusive results for the moderate contributor. A third area tested contained blood that included a mixture of DNA from Mr. Brock as the major contributor, and the results for the moderate contributor were inconclusive. A fourth area tested contained a complex mixture of DNA with testing yielding inconclusive results. A piece of duct tape contained Mr. Brock's DNA. Two pieces of duct tape contained Mr. Shelton's DNA. Another piece of duct tape contained a mixture of codefendant Graham's and the victim's DNA. Agent Fort did not find the presence of DNA from the Defendant or codefendant Cheeks on the items he analyzed.

The prior testimony of Cody Shelton, who was an unavailable witness, was read to the jury. Mr. Shelton testified that on July 21, 2013, he lived at the house where the incident occurred. He said that on the evening of July 20, a small gathering of friends occurred. He

-14-

agreed that alcohol and hallucinogenic mushrooms were available. He said people began leaving around 10:00 to 11:00 p.m. and that nine people remained in the house.

Mr. Shelton testified that the house had a basement, a second level with a living room, and a third level, where his bedroom was located. He said that about 2:00 to 3:00 a.m., he had been left bedroom to smoke a cigarette but heard a commotion from the basement as he reached the front door. He said that he went to the basement door, that he saw Mr. Brock being tackled by an intruder, and that a black, masked, gloved intruder pointed a gun at Mr. Shelton and told him to come into the basement and to lie on the floor. Mr. Shelton said he saw Mr. Berger and Mr. Correa, who were on their stomachs and bound in "hogtied" fashion with duct tape. Mr. Shelton said he was bound in the same manner. He said the intruders wore gloves and had their faces masked with bandannas. Mr. Shelton said one intruder held a crowbar. Mr. Shelton stated that the intruders asked for money, drugs, car keys, laptop computers, gaming systems, and similar items. Mr. Shelton said that when he did not respond to the intruders, one of the intruders hit his head with the intruder's fist. Mr. Shelton said the only item the intruders took was Mr. Correa's wallet. Mr. Shelton said that Mr. Roberts and Ms. Davis were brought downstairs and bound with duct tape. Mr. Shelton said the basement was "fairly dark" at the time.

Mr. Shelton testified that while two intruders were upstairs, the victim broke free of his restraints, came from the curtained area in the basement, and tackled the intruder who had remained in the basement. Mr. Shelton said that Mr. Berger and Mr. Roberts freed themselves and that Mr. Berger and Mr. Roberts picked up the intruder and "put him through" the ceiling and threw a television on the intruder's head. Mr. Shelton said that Ms. Davis, who had freed herself, threw a dumbbell at the intruder. Mr. Shelton said the struggle lasted less than five minutes and that the intruder yelled, "Hey, Dee, come down here. Come down here." Mr. Shelton said that the other intruders came downstairs and that one of them pointed a gun and shot. Mr. Shelton said the intruders ran away and that one returned "because . . . their shoes fell off."

Mr. Shelton testified that he had been shown photographs "to try to identify someone" but that he had been told he "got them all wrong." He identified photographs that he had been shown, including one on which he had written, "It looks like the guy who held me at gunpoint." He said he had not been confident in his identification of the person with the gun at the time he made it. The photographs were received as exhibits. Mr. Shelton said the Defendant had not been at the party and that the Defendant did not have permission to enter the house.

Clarksville Police Officer Christopher Nolder testified that, in April 2014, he was a homicide investigator and that he was assigned to investigate the victim's homicide. He said the Defendant and other individuals were interviewed at the Special Operations Unit on April 15, 2014. Officer Nolder said that he viewed Detective Ewing's interview of the

-15-

Defendant on closed-circuit television, that the Defendant was arrested at the conclusion of the interview, and that Mr. Cheeks and Mr. Graham were arrested the next day.

Clarksville Police Detective Eric Ewing testified that he interviewed the Defendant and other individuals at the Special Operations Unit on April 15, 2014. Detective Ewing identified a DVD containing the Defendant's approximate six-hour-and-twenty-minute wait before the interview, and the DVD was received as an exhibit. Detective Ewing identified a second DVD, which he said contained the Defendant's interview, and a transcript of the interview. The record reflects that the DVD and the transcript of the interview had been partially redacted. The DVD and the transcript were received as exhibits. The DVD of the interview was played for the jury.

The DVD reflected that in the interview, Detective Ewing told the Defendant that he knew the Defendant had been involved in a "lick that went bad" and that other individuals had identified the Defendant as the person who killed the victim. Detective Ewing stated that he wanted to know the Defendant's version of events and asked about circumstances which might indicate the killing had been accidental or in defense of one of the Defendant's companions. The Defendant stated that he was not a murderer and asked about the sentence length for "accidental homicide." The Defendant denied that he entered the house with the intent to kill anyone. He identified his intent as "[b]urglary." He said that he walked down the stairs, that someone "swung up" as he rounded the corner, and that the gun "went off." He denied that he pulled the trigger and agreed that "someone was coming at" him. He said he shot the person out of fear, but he maintained the gun "went off." He said he did not know how he "got the gun." He agreed that "several of 'em kinda broke free." The Defendant said that he had taken the gun due to "fear" and that "you never know what's around the corner." He said he had not intended to use the gun. The Defendant claimed he did not know if anyone had been hit by gunfire and that he ran without looking back.

In the interview, the Defendant stated that the idea to commit a robbery was formed about ten minutes beforehand but did not recall whose idea it was. He said he had been walking on a street with "his homeboy," who he did not identify by name, and that an unidentified person said, "[L]et's go. . . . [G]et on in." The Defendant said, "[G]et on in and . . . people just started laying down." He said he waited downstairs and eventually went upstairs and "grab[bed] a game." He said that he heard a sound, that he went downstairs, and that someone swung at him. He said the gun "went off." He said he ran, "waited outside for a second," and left in his car, which had been parked across the street. He said "T Dub" and "Kesha" were not present. He said that afterward, he went to Kesha's house and told her that he "f----- up." He said he told her that the gun went off and that he did not know if anyone had been shot. He said that he was scared and that he did not know anyone had been killed until the next day, when Kesha told him.

In the interview, Detective Ewing repeatedly stated to the Defendant that he did not think the Defendant was entirely forthcoming about the relevant events. Detective Ewing said he had information that something in the house upset the Defendant.

When the Defendant was pressed during the statement for more details related to the incident, the Defendant said he discarded the gun in Ringgold Creek about ten minutes after the incident, on his way to Kesha's house. The Defendant described the gun as a black, "highpoint" nine-millimeter. He said that he did not have the gun when the intruders entered the house and that they passed the gun among themselves. He said he began taking some of the house's occupants downstairs. He said that after the shooting, he had been outside but returned to the house to pick up a shoe belonging to "[m]y homey," whose name he declined to provide. He stated that he did not know who brought the duct tape and that he thought it had been in his car.

During the statement, Detective Ewing asked the Defendant to identify the intruder who was involved in the struggle with the house's occupants. The Defendant would not provide a name, but when Detective Ewing asked if the Defendant had seen "Joe" struggling, the Defendant stated he had not because "something jumped in my way." When asked who took Joe to the hospital, the Defendant stated he did not know. The Defendant acknowledged that Joe told him he "ran into the police" at the hospital. He later acknowledged that the person was codefendant Graham. He again stated that "T Dub" had not been involved. When pressed to divulge the name of the third intruder, the Defendant claimed that he knew the person's nickname but did not know the person's "real name" and that he had heard Detective Ewing use the person's last name. The Defendant later said the third person had been "Montavious, Moncavious Cheeks," whom the Defendant knew as "Trell."

In the interview, the Defendant admitted that he brought the crowbar to the house. When asked if he brought a crowbar and a gun, he said, "Um-hmm." He acknowledged that he told his friend, Paul Brunaul, about the incident afterward.

After the recording was played, Detective Ewing acknowledged that the Defendant maintained throughout the interview that the shooting had been accidental. When asked if the Defendant had stated in his interview with Detective Ewing that Ms. Davis had thrown a dumbbell at Mr. Graham, Detective Ewing responded, "Not that I'm aware of." Detective Ewing said that he interviewed some of the house's occupants and that none of the ones with whom he spoke stated that "something occurred with [the Defendant] that accidentally made the gun go off."

The Defense elected not to present evidence. After receiving the proof, the jury found the Defendant guilty of the following offenses:

**Count 1:** First degree felony murder of Miles Hendrick in the perpetration of or attempt to perpetrate burglary

**Count 2:** First degree felony murder of Miles Hendrick in the perpetration of or attempt to perpetrate theft

**Count 3:** Especially aggravated burglary of the habitation of Cody Shelton

**Count 4:** Aggravated kidnapping of Dillon Correa (as a lesser included offense of especially aggravated kidnapping)

**Count 5:** Especially aggravated kidnapping of William Brock

**Count 6:** Especially aggravated kidnapping of Christopher Roberts

**Count 7:** Especially aggravated kidnapping of Greg Berger

**Count 8:** Aggravated kidnapping of Brandy Davis (as a lesser included offense of especially aggravated kidnapping)

**Count 9:** Aggravated kidnapping of Cody Shelton (as a lesser included offense of especially aggravated kidnapping)

**Count 10:** Especially aggravated kidnapping of Miles Hendrick

**Count 11:** Attempted aggravated robbery of Dillon Correa

**Count 12:** Attempted aggravated robbery of William Brock

**Count 13:** Attempted aggravated robbery of Christopher Roberts

**Count 14:** Attempted aggravated robbery of Greg Burger

**Count 15:** Attempted aggravated robbery of Brandy Davis

**Count 16:** Attempted aggravated robbery of Cody Shelton

**Count 17:** Attempted aggravated robbery of Miles Hendrick

At the sentencing hearing, the trial court imposed a life sentence for the first degree felony murder convictions and merged them into a single judgment of conviction. The

court imposed ten-year sentences for the especially aggravated burglary conviction, twenty years for each especially aggravated kidnapping conviction, ten years for each aggravated kidnapping conviction, and four years for each attempted aggravated robbery conviction. The court ordered the sentences for Counts 3 through 17 to be served concurrently with each other and consecutively to the life sentence, for an effective sentence of life plus twenty years. This appeal followed.

# I

## Denial of Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress his April 15, 2014 pretrial statement. He argues that his statement was not freely and voluntarily given and was the product of coercive police tactics, given his approximate six-and-one-half hour detention before he was questioned. He argues that he was "alone, cold, and mentally fatigued" during the detention and questioning. The State responds that the court did not err in denying the motion. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); s*ee also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment of the United States Constitution, which applies to the states via the Fourteenth Amendment, provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. Art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). To be considered

voluntary, a statement must not be the product of "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). A defendant's subjective perception is insufficient to establish the existence of an involuntary confession. *Id*. The essential inquiry is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined [.]" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). A confession is involuntary if it is the product of coercive state action*. See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

In determining whether a confession is voluntary, a trial court examines the totality of the circumstances, which encompasses "both the characteristics of the accused and the details of the interrogation." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant circumstances include the following:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996) (quoting *People v. Cipriano*, 429 N.W.2d 781, 790 (Mich. 1988)).

In denying the motion to suppress, the trial court found that the Defendant was arrested pursuant to a capias for burglary charges and taken into custody on April 15, 2014, that he was advised of his *Miranda* rights, and that he executed a knowing and voluntary waiver of those rights. The court also found that the Defendant's statement was knowingly and voluntarily made.

The Defendant's argument focuses on the length of time he was held in isolation in an interrogation room before he was questioned by Detective Ewing and on his alleged physical discomfort and fatigue during this time. The record reflects that the Defendant was held for approximately six and one-half hours and that, during the wait to speak with Detective Ewing, police personnel came into the room from time to time to see if the

Defendant needed food, drink, or to use a restroom. The Defendant stated he was cold and asked for a blanket, but none was available. The Defendant was clothed in a hooded sweatshirt and sweatpants. During the interview, Detective Ewing wore a short-sleeved shirt and pants, and he did not see the Defendant chatter his teeth, shake, or shiver. Detective Nolder testified that several people were taken into custody at the same time as the Defendant and that the delay in interviewing the Defendant was due to the scale of the operation, in which several officers were involved in interviewing several individuals before the Defendant was interviewed.

We have reviewed the evidence offered at the suppression hearing, as well as the relevant trial evidence. The video evidence reflects that the Defendant sat for much of the time with the hood of his sweatshirt over his head and that he reported being cold and asked for a blanket. However, the record also reflects that the Defendant spoke at length with Detective Ewing without repeated complaints about physical discomfort or fatigue. The Defendant exhibited no signs of distress or impairment. Detective Ewing, who wore a short-sleeved shirt, was able to spend almost two hours in the interview room with the Defendant. The Defendant asked to use the restroom during the interview, and the interview was stopped to allow him to do so. Although Detective Ewing repeatedly pressed the Defendant to be forthcoming about all of the relevant facts, Detective Ewing remained calm and conversational throughout the interview and did not threaten the Defendant. Before the interview began, the Defendant was advised of his rights, and he signed a written waiver. Thereafter, he did not ask questions about his rights, state that he wanted to terminate the interview, or ask to speak to an attorney.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings. *See Odom*, 928 S.W.2d at 23; *Jones*, 802 S.W.2d at 223. In our review of the court's ruling on the motion, we have considered the court's factual findings from the suppression hearing and the trial evidence. *See Henning*, 975 S.W.2d at 297-99; *see also Williamson*, 368 S.W.3d at 473. We conclude that the trial court did not err in denying the motion to suppress.

In reaching this conclusion, we are mindful of the Defendant's argument that the issue should be analyzed under both Fifth Amendment and Sixth Amendment principles. As our supreme court has noted, the Fifth Amendment right to counsel protects against coercion, and the Sixth Amendment right to counsel ensures a criminal defendant's right to the assistance of counsel in all critical confrontations with State actors, without regard to coercion. *See State v. Willis*, 496 S.W.3d 653, 702 (Tenn. 2016); *State v. Berry*, 592 S.W.2d 553, 557 (Tenn. 1980). To the extent that the Defendant argues that the Sixth Amendment right to counsel applies to the present case, we note that the Sixth Amendment right is "offense specific." *See Texas v. Cobb*, 532 U.S. 162, 173 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (holding that the Sixth Amendment right to counsel

is offense specific, but the *Miranda* admonitions are not offense specific); *State v. Willis*, 496 S.W.3d 653, 707 (Tenn. 2016). In other words, "Statements obtained regarding an offense for which adversary judicial proceedings have not begun are admissible, even if they were deliberately elicited during an investigation of a separate offense for which there was a right to counsel." *Willis*, 496 S.W.3d at 707. In the present case, Detective Ewing testified that the Defendant was taken into custody on the morning of the statement as part of a large operation involving serving arrest warrants on several people related to an investigation of burglaries, multiple thefts of firearms, and internet-based crimes. Detective Ewing interviewed several individuals that morning related to the burglaries, during which he received information which led him to question the Defendant about the July 21, 2013 homicide of the victim and related offenses. Because the Defendant was questioned about the present offenses after being arrested for other crimes, a Sixth Amendment right to counsel relative to the July 21, 2013 offenses was not triggered. As we have stated, the Defendant was advised of and waived his *Miranda* rights, satisfying his Fifth Amendment rights. He is not entitled to relief on this basis.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his felony murder convictions. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn.

2009)).

The Defendant was convicted of first degree felony murder in the perpetration or attempt to perpetrate burglary and first degree felony murder in the perpetration of or attempt to perpetrate theft. At the time of the offense felony murder was defined as

> A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy[.]

T.C.A. § 39-13-202(a)(2) (2014) (subsequently amended). As relevant here, burglary occurs when a "person . . . without the effective consent of the property owner . . . [e]nters a building other than a habitation (or any portion thereof) not open to the public, with the intent to commit a felony, theft or assault [or] . . . [e]nters a building and commits a felony, theft or assault[.]" *Id.* § 39-14-402(1), (3) (2018) (subsequently repealed and replaced). The offense becomes aggravated burglary if the building is a habitation. *Id.* § 39-14-403(a) (2018) (subsequently repealed and replaced). "A person commits theft of property if, with the intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's consent[.]" *Id.* § 39-14-103(a) (2018).

The evidence viewed in the light most favorable to the State shows that the Defendant entered the house Cody Shelton shared with several other individuals without Mr. Shelton's consent and with the intent to steal items of value. Mr. Cheeks testified that after he, the Defendant, and Mr. Graham entered the house, the Defendant took $1 bills, which he, Mr. Cheeks, and Mr. Graham later divided among themselves. Mr. Correa and Mr. Shelton testified that the intruders took Mr. Correa's wallet, which Mr. Correa testified contained identification cards and money. Multiple witnesses testified that the intruders demanded items of value. The Defendant admitted in his pretrial statement that he took a video game he found in the house.

The evidence shows that during the course of the home invasion, the victim was fatally shot. Mr. Cheeks identified the Defendant as the shooter. The Defendant argues that Mr. Cheeks was not a credible witness. However, this court will not invade the province of the trier of fact by reassessing the credibility of witnesses and reweighing the evidence. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547. In any event, in his pretrial statement, the Defendant admitted taking a highpoint nine-millimeter gun to the house and holding the gun at the time it discharged, although he denied that he had intentionally fired the gun. The felony murder statute does not require that a defendant intend to commit the killing. Rather, it merely requires that a defendant have the requisite intent to commit the predicate offense and that a killing occurred during the commission of the predicate offense. *See* T.C.A. § 39-13-202(a)(2); *State v. Buggs*, 995 S.W.2d 102,

107 (Tenn. 1999). Mr. Correa identified the gun he saw during the incident as a black, highpoint nine-millimeter handgun. A black, highpoint nine-millimeter handgun was discovered in an investigation of an unrelated offense in the same neighborhood about twenty months after the offenses in the present case, and the gun was later identified through forensic testing to have been the highpoint nine-millimeter handgun from which a cartridge casing recovered from the scene had been fired.

The evidence is sufficient to support a conviction of felony murder in the perpetration of burglary. Likewise, the evidence is sufficient to support a conviction of felony murder in the perpetration of theft. The Defendant is not entitled to relief on this basis.

## III

### Consecutive Sentencing

In his final issue, the Defendant contends that the trial court erred in imposing a sentence of life plus twenty years and that he should have received concurrent sentences, resulting in an effective life sentence. The State responds that the court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. §§ 40-35-102 (2019), 41-1-126 (2019) (validated risk and needs assessments).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as

provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was received as an exhibit. It reflects that the Defendant was age twenty-two at the time of the offenses. The Defendant had prior convictions for five counts of burglary and a traffic offense. The Defendant was on probation for four of the burglary convictions at the time of the present offenses. He had pending charges in two unrelated cases. He reported that he left school after eleventh grade because he had attained enough credits to graduate. He reported good mental health and fair physical health. He reported he did not use alcohol before age twenty-one, did not use it to excess, and had never used narcotics or other drugs. He reported past employment in manufacturing and through a temporary service. The Strong-R risk assessment tool attached to the presentence report reflects that the Defendant is a "high risk level" for reoffending.

A victim impact statement from Ms. Davis was received as an exhibit. She stated that her television screen and laptop computer had been scratched during the incident and that she had bad dreams and flashbacks related to the offenses. She stated that she usually stayed home, other than to go to work, and that she carried a pocketknife for protection. She said that she was bruised from the restraints the intruders placed on her during the home invasion and that she had not received counseling because she did not want to talk about the ordeal.

After receiving the parties' sentencing memoranda and arguments, the trial court noted the Defendant's young age and his "significant criminal history." The court noted, as well, "the death toll that has taken place by the use of handguns in this community."

The court found that enhancement factors applied based upon the Defendant's prior history of criminal convictions or behavior, his having been a leader in an offense that involved two or more criminal actors, his failure to comply with the conditions of a sentence involving release into the community, and his having been on "bail or partial

-25-

release" at the time of the offenses. *See* T.C.A. § 40-35-114(1), (2), (8), (13) (2014) (subsequently amended). The court found that the Defendant was not entitled to the application of any mitigating factors.

The trial court merged the first degree felony murder convictions and imposed a life sentence. For the remaining convictions, the court imposed ten-year sentences for the especially aggravated burglary conviction, twenty years for each especially aggravated kidnapping conviction, ten years for each aggravated kidnapping conviction, and four years for each attempted aggravated robbery conviction. The court ordered the sentences for Counts 3 through 17 to be served concurrently with each other and consecutively to the life sentence, for an effective sentence of life plus twenty years.

In imposing consecutive sentences, the trial court found that the Defendant was a dangerous offender whose behavior showed little regard for human life and that he had no hesitation to commit the offenses when the risk to human life was high. *See id.* § 40-35-115(b)(4) (2019). The court noted that the Defendant and his codefendants' planning the offense by identifying the target, going to the Defendant's house and returning to the target house, entering the basement, and having one person watch the house's occupants in the basement while the other intruders searched the house for items to steal. The court also found that the Defendant committed the offenses while on probation. *See id.* at (b)(6).

On appeal, the Defendant argues that "anything more [than a life sentence] is simply a misuse of Justice" and that the trial court imposed, in effect, a sentence of life without parole. Despite his burden to show that the court's sentence was improper, the Defendant has not identified any errors in the court's findings relative to the applicable statutory factors for consecutive sentencing. *See Ashby*, 823 S.W.2d at 169 ("The burden of showing that the sentence is improper is upon the appellant."). The court's findings that the Defendant was a dangerous offender pursuant to Code section 40-35-115(b)(4) and that he was on probation at the time of the offense pursuant to section 40-35-115(b)(6) are supported by the record. The record likewise reflects that the court was mindful of its obligation to impose a sentence no greater than what was deserved for the offenses and which was "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *See* T.C.A. § 40-35-103(2), (4); *Desirey*, 909 S.W.2d at 33.

We conclude that the trial court did not abuse its discretion in imposing consecutive sentencing. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE